JOURNAL ENTRY AND OPINION *Page 2 
{¶ 1} Defendant Alex Jordan appeals from a judgment of conviction on one count of failure to comply with an order or signal of a police officer. The charge arose when defendant sped away from an officer who had stopped him for speeding. Jordan complains that there was insufficient evidence to support the judgment of conviction and that the judgment of conviction was against the manifest weight of the evidence. Neither assignment of error has merit, so we affirm.
 I {¶ 2} For his first assignment of error, Jordan argues that the court lacked sufficient evidence to find him guilty of failing to comply with an order or signal of a police officer. He maintains that the evidence did not show that he had been the driver of the vehicle that fled from the traffic stop.
 A {¶ 3} When reviewing a claim that there is insufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1981), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 4} The state charged Jordan with a failure to comply with an order or signal of a police officer under R.C. 2921.331(B). That section states that no person shall operate a motor vehicle "so as willfully to elude or flee a police officer after receiving *Page 3 
a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."
 B {¶ 5} A Village of Linndale police officer testified that on the night of the offense, he had been conducting radar speed enforcement on an interstate highway. A white minivan passed and the radar registered a speed of 76 miles per hour. The officer pulled the minivan over near an exit ramp. As the officer called in the location of the stop and license plate number, he noticed the driver of the minivan looking at him through the driver's side mirror. The driver of the minivan made movements and appeared to be speaking with another occupant of the minivan. The officer also noticed that the driver had not engaged the parking gear, but had continued to stop the minivan by using the brakes. The officer exited his cruiser and approached the rear of the minivan, but the minivan sped away. The officer testified that he saw the driver's face in the side view mirror and described the driver as having some facial hair and wearing a "skull cap or black cap," with hair falling from the back of the head covering.
 {¶ 6} The officer returned to his cruiser, radioed that the minivan had fled, and gave pursuit with signal lights and sirens activated. The minivan had pulled away from the officer, causing the officer to lose sight of it. He turned off his siren in anticipation of terminating the pursuit, but then saw the minivan in the distance, traveling at a high rate of speed. The officer also saw a police car from the city of *Page 4 
Cleveland initiate a turn and pursue the minivan with its lights activated. When the two police cars next caught sight of the minivan, they saw it had struck a parked car. The minivan doors were open and no passengers were present. The police learned that the occupants of the minivan had fled down the street. They arrested a female and a clean-shaven male about half a block away from the minivan. They also discovered a bloody football jersey and white t-shirt between some houses. The officers returned to the minivan and conducted an inventory search before towing it. They found a black, fleece jacket that contained a state identification card with Jordan's name and photograph. The officer testified that the picture shown on the identification card looked "closely" similar to the driver of the minivan. The police also recovered a black skull cap that the Linndale officer said was the same cap he saw Jordan wearing at the time he pulled the minivan over.
 {¶ 7} An EMS worker testified that he responded the following morning to an emergency call about a male who fell. When he responded on the scene, he found Jordan lying face down on the ground. In his report, the EMS worker stated that "patient states that last night he was running from the police when he jumped over a six-foot high fence and fell and he hurt his back and could not get up."
 {¶ 8} The Cleveland police officer who pursued the minivan testified that when he came upon the stopped minivan, he saw severe damage to the vehicle's front-end. None of the occupants of the minivan were present at the scene of the crash. *Page 5 
He said that he quickly inventoried the vehicle and found the coat with Jordan's I.D. He was told that some of the occupants of the minivan had fled down the street.
 {¶ 9} Jordan offered testimony of three family members who collectively testified that Jordan stopped by their house unannounced at 1:00 a.m. He visited for awhile, but none of them could say why he stopped, nor could they recall the substance of the conversation. Jordan left after about an hour, entering the passenger side of the white minivan. One of the defense witnesses confirmed that Jordan had been wearing a black "scarf" on his head.
 {¶ 10} Jordan testified that he stopped by the house at about 1:00 a.m. to see his half-sisters, even though it was a school night for the sisters. A friend named Rayshawn Dawson called him and said that he would pick up Jordan and together they would travel across the city to a bar. They were on the interstate when Jordan realized that he left his cell phone at his sisters' house. Dawson was speeding back to the house when stopped by the police. Dawson asked Jordan what he should do, and Jordan said, "you do what you want to do." Dawson then pulled away. After they crashed, Jordan said he panicked and ran, shedding his jacket and shirt in order to be "lighter" while running. He further testified that he was on top of a garage when he decided to surrender to the police. An officer pulled him from the roof, causing him to fall on the ground and suffer injuries. He claimed that the police used their tasers on him for approximately 20 minutes, causing him to blackout, and then left *Page 6 
him lying on the ground. He denied telling emergency and medical personnel that he had been running from the police. He also denied having any covering on his head.
 C {¶ 11} Viewing the evidence in a light most favorable to the state, we conclude that the state presented sufficient evidence from which a rational trier of fact could conclude that Jordan had been identified as the driver of the minivan. The Linndale officer saw Jordan in the mirror of the car, and testified that he recognized the photo I.D. card later recovered from the minivan to be "a very close similar look [sic] of the driver that I saw with the facial hair and the hair coming down below the cap." The officer also identified a black skullcap as the same one that Jordan had been wearing during the traffic stop. This was a sufficient identification of Jordan as the driver.
 {¶ 12} The state also presented evidence that Jordan drove away from the traffic stop after having been pulled over, thus establishing the elements of a failure to comply with a lawful order or signal by a police officer. By pulling off the interstate, Jordan obviously saw the initial signal to stop. His subsequent flight from the traffic stop and high speed attempt to evade the police, who were pursuing with lights and sirens activated, was sufficient evidence to establish that he was aware of the signal and failed to comply. See State v. Love, Summit App. No. 21654, 2004-Ohio-1422, at Tf19 ("[a] jury could reasonably find that speeding * * *, running stop signs and red lights * * *, and driving down the middle of the road while police officers were in pursuit *Page 7 
with lights and sirens activated * * * constituted failure to comply with an order or signal of a police officer").
 II {¶ 13} In his second assignment of error, Jordan complains that the court's judgment of conviction is against the manifest weight of the evidence. He maintains that the officer's identification was not worthy of credit because the officer only saw Jordan's face from a distance, reflected in a side-view mirror, in poor light conditions on an interstate highway. Moreover, he maintains that the state's testimony is fatally inconsistent with defense testimony by Jordan's family.
 A {¶ 14} When reviewing a claim that a verdict is against the manifest weight of the evidence, we weigh all the reasonable inferences, consider the credibility of witnesses and, in considering conflicts in the evidence, determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Thompkins (1997),78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, we remain mindful that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v. Antill (1964), 176 Ohio St. 61, 67. *Page 8 
 B {¶ 15} The court did not lose its way by finding Jordan guilty of failure to comply with an order or signal of a police officer. Jordan's attempts to discredit the Linndale officer's identification are unavailing. While a late-night identification from a reflection from a driver's side mirror is not necessarily credible by itself, the Linndale officer's testimony was corroborated in one important respect: the officer said that Jordan had been wearing a black cap or skullcap, and one of Jordan's sisters confirmed that Jordan had been wearing a scarf on his head when he visited her shortly before being stopped by the police. The police recovered that same skullcap from the minivan.
 {¶ 16} Jordan's evidence lacked credibility in almost all respects. He claimed to have dropped by to visit his sisters at 1:00 a.m. on a school night, yet neither of the sisters could recall any details of the visit other than that he had been wearing a scarf on his head. He offered no explanation as to why he did not run to his sisters' house after the crash, even though the crash occurred just a few houses down the street from that house. He claimed to have told emergency personnel that he suffered his injuries because the police beat him, yet the EMS testimony and hospital records were in agreement that he said he had been running from the police and fell while jumping a fence. Finally, his claim that he had been pulled from the roof of a garage by the police, tortured and then abandoned was unbelievable. Jordan gave no *Page 9 
explanation as to why the police would engage in a high speed pursuit and foot chase, only to leave him.
 {¶ 17} We also reject Jordan's contention that the court should not have found him guilty because it stated that it did not find any of the witnesses to be credible. During sentencing, Jordan insisted that he had not been the driver of the car and wanted to know why the police had not taken fingerprints from the minivan. He also questioned how he could cause himself "$6,000 in personal injuries from running from the police?" The court replied, "[m]aybe it was when you hit the other car." Jordan replied, "I wasn't driving the car." The court then replied, "[l]isten, I listened to the testimony. I heard all the witnesses. I didn't find anybody credible. How about that? I made my determination, and I'm comfortable with my determination. You can appeal that." We believe these comments, although maybe harsh, were inconsequential in light of the evidence produced at trial.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. *Page 10 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 SEAN C. GALLAGHER, P.J., and KENNETH A. ROCCO, J., CONCUR *Page 1